Good morning, we have five cases on argument today. We've got four cases on oral argument and one case has been submitted on the briefs. So let's start with the first case, High Point SARL v. T-Mobile, 15-1235. Mr. Black? Thank you, Your Honor. May it please the Court. The District Court erroneously concluded that three of T-Mobile's suppliers held licenses to the patents in suit and then misapplied this Court's decision in Keurig by failing to perform a claim-by-claim exhaustion analysis. T-Mobile makes a claim of exhaustion in this case, not license. So it's important to understand what the relationship was between the particular suppliers at issue and T-Mobile at the relevant time. I'd like to begin with discussing the District Court's analysis of exhaustion in relation to sales made by NSN-US to T-Mobile. Prior to 2007, T-Mobile was buying Nokia products from Nokia, from Nokia's telecommunications business. In 2007, Nokia and Siemens entered into a joint venture. They formed a Dutch joint venture. The Nokia business was contributed to the joint venture and the Siemens business was contributed to the joint venture. Siemens had previously entered into an agreement with AT&T that covered the patents in suit and granted limited rights under a divestment rider. The divestment rider had three crucial elements. The license can be extended to the divested business only, not a third-party business. The license is limited in time, applying only while the future divested business is operated as a separately identifiable business. And the license is limited in product scope, only to the extent applicable to products and services sold by the future divested business prior to its time. Counsel, we have a number of issues, very distinct issues related to the license that you're now referring to. Maybe it will help if we have you give argument as to some of the specific issues, such as the of-kinds construction, whether that is too broad or not. Certainly, Your Honor. There are three elements separately identifiable. The purchase has to be from the divested business and the kinds of products. So with respect to the kinds of products, the record is uncontested that prior to the joint venture, T-Mobile was buying Nokia products, Nokia-designed products from Nokia's U.S. affiliate. It's also uncontested that after the joint venture, T-Mobile continued to buy the exact same products from Nokia, that is from the Nokia divested business, not from the Siemens divested business. The license only goes to the Siemens divested business. It also only goes to the Siemens divested business for so long as the Siemens business is separately identifiable. That's a common provision in these sorts of agreements designed to prevent the expansion of the license upon a divestiture. When a business is divested, the licensee may well want for the business that's using the patents to continue to be able to use it, but the licensor would not want the divested business to be purchased and then expanded license to occur so that an entirely new business that's not paid any royalties could gain a license for free. Now I saw you argue that in the brief, but I didn't see you point to anything to support that argument, that contention. I guess what I'm trying to figure out is what does separately identifiable mean and why was the district court's conclusion of what it meant unreasonable? How do we know what separately identifiable means? You say it means what you say it means, but how do I know that? Well, if you look at the structure of the divestment rider, it was entered into at a time when AT&T was splitting into three separate companies, and the companies got together and they had a special rider to deal with divestments. And what is the problem that would likely have been in the minds of people worrying about the expansion of patent rights to divested businesses? The concern is how do you make sure that things are done fairly, that the divested business, say a division which is doing something, can continue to operate for some time, but that that doesn't expand unfairly to cover an entire new company which hasn't paid a license right. If our contention on this is at least plausible, then we win, because this was at summary judgment, and the district court made a conclusion as a matter of law that our construction was wrong. And at the minimum, our construction is a reasonable one. So what would you want? Would you want it to go back to the district court to do some kind of discovery as to what was some extrinsic evidence as to the meaning of separately identifiable? I think that there was none submitted, and that separately identifiable, if there are two alternatives, the alternatives would be, one, that it just means separately identifiable from the entity which divested the business, which would mean it's a nullity. There's no reason to write that kind of provision, because the divested business by definition has been divested and separated from the original entity. So a contract should not be construed in a way which gives no effect or meaning or which doesn't make commercial sense. They took a lot of care in drafting it. But you're saying that it separately identifiable somehow necessarily means it can't be a joint venture, and how do I know that? It could be a joint venture. The problem is not the joint venture. The problem was when they combined the Nokia business with the Siemens business, and also they faded out the Siemens business. The contract clearly says that only the divested business is licensed. The divested business was only the Siemens division originally. According to the evidence, they phased that out. The other problem is there's no evidence that any part of the Siemens divested business was ever acquired by the NSN United States company, which actually made the sales here. Siemens was very big in Europe, not in the United States. So they have to show that they bought from a divested business. They have to show that the products were ones that were being sold at the time. And as soon as the business is no longer separately identifiable, the license lapses. None of those things were shown below, certainly not at the level required to grant summary judgment. With respect to—I'm going to move on to Erickson, unless you have any further questions. With respect to Erickson, we have two different issues. First— So I'm sorry, just back to separately identifiable. You say the correct understanding is what? Separately identifiable from the acquirer's business. And what normally happens—look at the Rembrandt case, for instance. In Rembrandt, what happened is there was a modem business. And the modem business was spun off—it was a business within a larger company. It was spun off into a separate company, and then that company, I believe, went public. So in that situation, you've got a separately identifiable business, the modem business. The problem would come if that business was purchased by somebody gigantic, say somebody like Lucent or General Motors or IBM. They would get a free license. They can't—if they combine the telecommunications businesses together, and that wouldn't be fair. What are the characteristics in corporate form? What are the corporate form characteristics that you would have us look at in order to determine whether a particular entity is separately identifiable or not? Thank you, Your Honor. That's a great question, and the reason is there's been a lot of confusion in the briefing about whether or not we're taking the position that a joint venture is somehow excluded. That's not the position. They could have formed a joint venture, contributed the Siemens telecom business. Oftentimes, a joint venture, for example, may have overlapping board of directors, or you may have corporate officers that are lent from one entity to the joint venture, and the name itself may reflect the names of the two entities that are joining together for a particular purpose. That's what I'm— Right, and that's actually what we have here. It's Nokia Siemens Networks is what NSN stands for. And what happened, though, if they had done a joint venture where they contributed this business, and maybe they contributed—and then maybe Nokia contributed a different business, a cell phone business, not base stations and the things at issue in this case, maybe there wouldn't be a problem. If the joint venture was the contribution of the Siemens business on the one hand and the Nokia money, for instance, and that they therefore went forward in the world together, maybe there wouldn't be a problem. But once you mix two businesses together that have the same business, you have a problem and you have an extension of the patent rights, and that's what was negotiated for here. This is a limited right, but the license only goes—the key point is not really the joint venture. The key point is that the license goes only to the divested business. The divested business, by the way, is a defined term in the 2009— And are you saying that that's a genuine issue that should have been decided by a jury in this case? I think actually it certainly can't grant summary judgment on this record because the evidence is the Siemens business was shut down, and the evidence is that T-Mobile did not buy any products from the Siemens business. So the summary judgment motion should have been denied. We didn't file a cross motion on it, so that's not before you, but certainly— So you want separately identifiable to mean that whatever the divested business is or turns into, it can't—the license doesn't encompass practices that are coming from other companies? That's what's separately identifiable? If there are two businesses that are combined and they're in the same business line, the Siemens business has to remain separately identifiable. You have to be able to point to something in the new company. If General Motors, which doesn't have a wireless infrastructure business, bought this business, and it remained separately identifiable to the market as something which people could buy products from, fine. But once you put the two together, you mix the product lines. Or in this case, they actually dropped the Siemens business, and that resulted in that there was no divested business anymore at all, let alone a licensed business. Okay. You better go to the Erickson issue because you're running out of time. Yes, Your Honor. The exhaustion defense fails with respect to Erickson for two critical reasons. First of all, the right granted here was supposedly a sublicense, but a sublicense can only—can rise no further than the license. And in the agreement, the license expired when the patent expired at the end of 2011. So here's the problem I'm having with the argument that you're making. These are sophisticated entities. They're big players. And they wrote an agreement, but yet the agreement permits this retroactive sublicense to be extended. There's nothing in the agreement that prohibits that. Now, I understand that the patent has expired, and maybe your argument is that the underlying authority has, you know— Yes. —expired with that. But that's—apparently the parties chose to negotiate and to extend this right to retroactively extend a license beyond the life of the patent. Well, it's a little bit like an option, Your Honor. It has to be—it has a time period on it. They had a right to grant a sublicense, but if you want to call it a sublicense, as they did, they have to extend it during the period when the license is active. The problem here is it doesn't make any sense to apply retroactive exhaustion, which is a new doctrine. That may be true in most cases, but here's a specific provision that permits a retroactive application that's open-ended. At least it appears to me to be the case. I understand what you're saying. This agreement should be construed within its words. There really is no such thing as a retroactive sublicense under Ethicon and under the court's— But there is in this license. Well, I know, but the question is—there's two things, two issues, and I'm going to get to the second one because I think that's the dominant one. One is can they grant a sublicense under these strict words of this agreement when the license has lapsed? The answer is no. Your Honor says they're sophisticated people. I don't think they contemplated this. I don't think everybody ever thought that one of the parties would let the license expire, and then litigation would ensue, and 10 years later they'd try to— Why not? I mean, if you have a party that's granting another one this open-ended right to, for example, a blanket extension to all subsidiaries, and then there's this retroactive provision as well, why didn't the parties put a date on that and say, okay, gee, maybe we better not permit this to happen beyond the life of the patent? Well, it's not in the agreement. They didn't have the authority to grant it. It's like an option. It needs to be construed strictly. But I want to move to the other question, which is even assuming they had a right to do this, what is the effect? There's no license to T-Mobile. Their claim is exhaustion. And they want to make a claim that this court extend the exhaustion doctrine to retroactive exhaustion. Exhaustion was designed to deal with a specific problem. You had patent holders who were selling a product and then trying to control the downstream issues related to the product and trying to get a royalty twice and extend the patent monopoly. Did that happen here? No. What happened? Products were sold to T-Mobile. They installed them in their network. Infringement occurred. A matured claim occurred at that point, which has a separate character from permission and a license. And then the patent expired. There was no abuse of the patent monopoly by the patent holder. There was no extension of the patent monopoly unfairly. And what they're asking you to do is to create for them a doctrine which would help them out of the problem they had because they didn't grant the license early, which would have wide-ranging effects. What's the purpose of a retroactive license? Isn't it to protect the licensee, sub-licensee, from liability for past activities? I think that's probably the intent. In Ethicon and standing cases, the court has said we're not necessarily going to give that effect. I would point out one important thing, though, with respect to this particular sub-license, and it's dispositive if Your Honor thinks it's some sort of release, which is that this sub-license was a license between LME and Ericsson, Inc. So even if it has some effect for Ericsson, Inc., it doesn't have any effect for T-Mobile unless you go further and adopt the concept of retroactive exhaustion, which I suggest is not consistent with the exhaustion doctrine, which is very much focused on the character of the infringing sale and whether the patent holder has abused the monopoly. All right. We used up your time. I'm going to restore your three minutes, okay? Thank you, Your Honor. Due to the questions that we had. Mr. Bansali? Yes, thank you, Your Honor. Did I pronounce that correctly, sir? Very well. Thank you, Your Honor. And you have 15 minutes. I'll give you a little extra time if you want, but if you need it only, okay? May it please the court, Asim Bansali of Keckerin Van Nest LLP for T-Mobile USA. I'd like to start where you left off, Judge Reyna, which is that these are big players, as you called them, and that observation actually applies to all of the licenses we're dealing with. AT&T and Lucent, when they licensed these patents in the 80s and 90s, received fair compensation in the form of the freedom to operate free of patent risk from their major competitors, Siemens, Ericsson, and Alcatel, and also received substantial monetary compensation. Once the district court interpreted the licenses to enforce those promises that Lucent and AT&T made against the current holder of their patents, the district court engaged in a straightforward application of the exhaustion doctrine in order to find high points claims exhausted. Why don't you address the separately identifiable limitation? Yes, Your Honor. That limitation was written into the divestment rider, which was drafted by AT&T. If you look at the rider, it's on AT&T letterhead, and it says exactly what it says. It says that the business has to be separately identifiable. Separately identifiable from who? Separately identifiable from what? From any other business. And AT&T, in the parent license, in the 1988 parent license… Let's say you have a joint venture and you're going to apply the separately identifiable. You say from any business. So you seem to argue that the fact that it's divested is sufficient. The fact that it's divested, and you can look at the divested business and say this is a freestanding, separately identifiable business. Assume the divested business now assumes an acronym or a name that's built out of both entities in a joint venture. Is that separately identifiable? That's certainly one characteristic of it being separately identifiable, and in this case, Your Honor, actually your hypothetical existed here because it was Nokia Siemens Networks. And so one could look at Nokia Siemens Networks and say that it was the identifiable business, separately identifiable business that came from the divested Siemens business. Doesn't that name give rise to question that maybe they're not separate? The fact that the entities retain the name that make perhaps there's a controlling interest by one entity, overlapping board of directors? Well, certainly the name suggests that it's a joint venture. I think as Mr. Black conceded here and that Highpoint concedes in their reply brief, there's no prohibition on a joint venture. What you have to look at is, is this joint venture separately identifiable? And we at page 21 in our opposition brief. I still don't understand what separately identifiable means. What if Nokia had bought this divested business? Would that be separately identifiable? I think you would have to look at the characteristics of the business in that, in the arrangement as it existed. As I understood the district court's opinion, the answer would be yes because whatever that is, Nokia's purchase of that divested business, it would be separately identifiable from Siemens. And that's how I understand how the district court understood separately identifiable. And to me, that arguably makes the term separately identifiable redundant in light of the fact the contract already says divested business. So let me respond to that with two points. I think first with respect to the district court's opinion, I think one has to read that in the overall context, which is that we explained in our papers in the district court that NSN was operated separately and independently from both Nokia and Siemens. And you could identify it separately and independently. And the evidence- Where does that take us though? The fact that NSN operates independently of Nokia. I mean, what does that matter? Well, what it relates to is that ultimately AT&T, if they wanted to put additional restrictions into separately identifiable, they were a sophisticated party who had the ability to write that in. And in fact, in the parent license, the 1988 Siemens license, they have specific terms, for example, on the ownership that's required of a subsidiary in order for it to be licensed. And the divestment rider actually incorporates, for example, the time period term of the parent license. So if, for example, AT&T wanted the divestment rider not to apply if the divested business became a subsidiary of another company, they could have written that into the license. They chose not to do that. The district court simply applied the plain language to interpret it as requiring only separation from any other business. Now, I recognize that in the district court's opinion, the late Judge Irenas focused only on separation from Siemens, but the record is undisputed that NSN was also separate from Nokia. And page 21 of our brief, we cite all the evidence that was undisputed about that separation. But your argument is separate because it was divested. That it was separate, yes. That it was divested actually both from Siemens and that to the extent the Nokia business was part of NSN, that was also separate from Nokia. Can you envision a divestiture, a joint venture, where you really don't have a separate distinct corporate entity? Sure. I mean, hypothetically, two companies could have a joint venture where they combine their business efforts and the company doesn't operate independently. It's just two divisions of businesses operate together. So if the court looks at this and simply says we have a divestiture, that's enough, isn't there more to that? Don't we have a genuine issue of fact as to whether there's actually an identifiable distinct entity? Your Honor, hypothetically, there could be a genuine issue of material fact. On the record in this case, all of the facts regarding the operation of NSN were undisputed and that it operated independently of both of the companies that contributed their businesses to it. I'm still lost. Are you saying if Nokia – I don't understand what your answer is if the fact pattern was if Nokia had bought this divested business from Siemens. Or if whoever AT&T's largest arch enemy competitor is ended up buying this divested business from Siemens. On one hand, one could argue, yeah, that's separately identifiable, that concern that is now selling all kinds of licensed equipment. Would that fit within your definition of separately identifiable? Not if it is rolled up into the parent business such that the purchase, the divestiture from Siemens is merely an artifice to obtain license rights. That's not the situation we have here because we have a bona fide business transaction that created a separate independent entity. How do we know we have a bona fide transaction that created some, you know, breakaway from Nokia? The record establishes that NSN was operated independently, that it was created as a joint venture of these two businesses. It had its own board of directors. Yeah, but most of them are from Nokia, right? Well, actually, it had directors from both Nokia and from Siemens. But the majority were from where? There was – I believe there was – the majority was from Nokia. But there's no evidence that – and again, the record evidence here that the judge ruled on was undisputed. NSN did not somehow have fealty to Nokia and it wasn't carrying out a Nokia business agenda. It was operating as an independent entity. High Point never developed or offered any evidence in the summary judgment record to dispute the independent operation of Nokia. Was there argument below as to the independent operation of the joint venture? Yes, Your Honor. Absolutely there was. It was set out in our summary judgment papers. And again, at page 21 of our brief in this court, we cite that evidence. And it's notable that neither in their opening brief nor in their reply brief does High Point offer any evidence that Nokia engaged in any kind of control that would have affected the operation of NSN. Did High Point make those arguments before the district court? The – High Point argued before the district court only that separately identifiable could not cover the Nokia products. And there's an important issue there because under the Rembrandt case, interpreting the exact kind of divestment rider from AT&T, this court previously held that the category of products covered by this divestment rider is broad and is not limited to a particular product line that existed at a particular time. And correct me if I'm wrong, but it seemed to me that High Point was arguing below that we did not have a separately identifiable business solely on the basis of products, not corporate form. Your Honor, I would agree with that. And then after seeing the Rembrandt case, High Point has sort of shifted its argument and tried to sort of wedge that product limitation that they want into the separate identifiability issue. But this court in Rembrandt, interpreting the exact same kind of divestment rider, treated those as different issues. And on the product issue, Rembrandt is very clear that it's a broad license that's not limited to a particular kind of product so that if Siemens had divested the business not into a joint venture but into just a Siemens divested business and then they had acquired the Nokia product line, we wouldn't be here. And so what High Point is really doing is essentially sort of a form over substance argument that says, well, because this is a joint venture, now we can get around Rembrandt and limit the products that the joint venture is licensed to sell. And that's just not appropriate because this court really treated those as two separate limitations in Rembrandt. What do you think the purpose was of this rider? I mean, the other side is saying the purpose of this rider was to make sure that the licensing rights were maintained within the scope of whatever Siemens had previously been doing but now it's going to be occurring in a divested business. And to ensure that other competitors that are unlicensed weren't going to be able to somehow enjoy the benefits of the license. Is that a fair understanding of the rider? Your Honor, I would say that that's sort of I think a gloss. What else would it mean besides that? So I think it has to be viewed in that context, which is actually in order to obtain operating freedom for AT&T's businesses rather than to limit their operating freedom. So with that context, I think the purpose of the separate identifiability rider is in order to prevent somebody from using a divestiture and acquisition as an artifice to obtain license rights. It's not in order to govern what future form AT&T's spinoff businesses and their licensing counterpart spinoff businesses would take. There's no suggestion of that in the license agreement. Well, is it true what the other side says that the joint venture ended up selling predominantly the Nokia-based line? So they sold in China. They sold the Siemens line. In other markets, including the U.S., they consolidated the product lines. And actually after the joint venture was formed, the products became backwards compatible, quote unquote, to the Siemens product line. In other words, it was a joint NSN product line. And admittedly, it used the model names of in many instances the Nokia products. But those were compatible with the Siemens products. And they had a joint R&D. I mean, the R&D came from both companies. And again, all those record facts are cited at page 21 of our brief. Can you address the Erickson license, please? Yes, Your Honor. With respect to the Erickson license, again, I think Your Honor hit the issue, which is that these were sophisticated parties. And they intentionally included this right to retroactively sublicense so that you didn't have to necessarily execute the license prior to a subsidiary's practicing the patent. You could come back and execute it later. Now, Mr. Black has suggested that, well, even if they had intended that, the license should not run past the expiration of the patents. But, of course, the right to sue for damages, as the court is well aware, runs for six years after the expiration of a patent. And so the need for a retroactive sublicense would continue during that six years. I think Judge Chen very recently recognized in the Keranos case that a license's validity should not turn on the fortuity of whether it's executed immediately prior to a patent's expiration or immediately after a patent's expiration. Now, in Keranos, the court was dealing with an exclusive license. But a non-exclusive sublicense, actually, the same reasoning applies to that kind of sublicense and, in fact, arguably is stronger there. That, you know, here we have a contract. The parties clearly anticipated that in the future, one of, again, Lucent or L.M. Erickson, this is a retroactive provision, I mean, a reciprocal provision that applies both ways. One of their subsidiaries may need a retroactive license. That's what we have here. It seems to me that it's pushing a little bit too far to say that the parties foresaw a situation where subsidiaries are sued for infringement and then there's a retroactive application of a license to those subsidiaries in order to cover them. Your Honor, I think we – I would say two things. First, one thing to be clear, from the beginning, Lucent gave up its rights to these patents vis-a-vis any Erickson subsidiaries. This isn't a situation where Lucent had to provide consent or they had to be given notice. Lucent authorized L.M. Erickson and its subsidiaries to practice these patents without any restriction and gave L.M. Erickson the sole right to sublicense. And so this is akin to the Tessera case where a license was granted. And there, there was actually an express condition that the license was conditioned on the payment of royalties. But the court said it didn't matter. You granted an authorization to practice the patents, and therefore this other condition that had to be satisfied is a contract issue. It doesn't limit the authorization that was granted to practice the patents. We have the same thing here. Lucent gave up its rights. There's no dispute about that. The only question is whether L.M. Erickson perfected the requirements to exercise those rights. We think under the contract they did that. They had the right to do that retroactively. But even if they didn't, Lucent had given up its rights, and therefore there's— Do you have anything additional to say about the retroactive exhaustion argument by the other side? Or is it the same essential principle? It's the same. It's the Tessera principle that once you've authorized your honor, that triggers exhaustion. Okay. You've got about 13 seconds left. Do you want to sum up? Yes, Your Honor. I would like some. The last thing I would say is that this was a very well-considered situation. It wasn't, as High Point has suggested, a casual decision by the district court. There's 7,700 pages of record. There was a two-hour summary judgment argument that ran about 100 pages. It's at the end of the appendix, the joint appendix. So this was not something that the district court just did on an unconsidered record. This was after two years of litigation and extensive briefing and argument. Okay. Thank you very much. Mr. Black, we have three minutes. Thank you, Your Honor. First of all, there's been an assertion made, which I find rather surprising, that we didn't argue the separately identifiable point below. I would point to the district court's opinion at page 24, where he notes that he takes the divestment clause and says, Point A, only while the future divested business operates as a separately identifiable business, and B, only to the extent applicable to products and services. He writes, High Point argues that the sub-license was not authorized because neither conditions A and B were satisfied. Did you make specific arguments as to corporate form and whether the corporate form could be a characteristic of a separate identifiable business? I'm not sure I understand. What we argued was that— You seem to have argued that separately identifiable was determined by the products that are being sold. I think what we argued, and I maintain the position, is that you need to look at what actually happened with respect to the businesses. There's a business and another business, and you combine them. In a joint venture, you're likely going to end up with a situation where they aren't combined. They caricatured our argument as being that, well, there's a joint venture exception. That's not what we're saying. What we're saying, though, is when they combine the businesses, they combine the boards, and a lot of this evidence is in the record, including in the appendix on appeal, A62, 32, 33, et cetera, the statement of facts. We established what happened with the business, how they were combined, how there was a new board of directors. That board of directors was controlled by Nokia, how the Siemens business was then discontinued, how everything was controlled by this new and combined business. So we did make all those arguments, Your Honor. Wait, you're saying the joint venture was controlled by Nokia? It was, yes. The board was split, but Nokia had majority control, and their financials were consolidated up to Nokia. Nokia OY or whatever the deal was. And you're saying you argued that on that basis you did not have a separate identifiable board? But specifically their carrier business. Yes. Right? If it was any other business, you wouldn't care. I think we might not have the problem, because then to the market, the business would be separately identifiable to the people who were selling it. That's who it matters to. It's not unlimited. I think the fair construction would be that, say, all Nokia contributed was $100 million of capital and the Siemens business, then maybe we certainly wouldn't be here today. If we were to say that this contract provision was ambiguous and it needs to go back for further development of the record, what could really be uncovered, discovered, gleaned from extrinsic evidence to help understand separately identifiable? As far as the understanding of separately identifiable, I'm not sure that there's much more that could be found. I don't know. With respect to the facts, we have a pretty extensive record. This was the main issue for us on NSN, and we have a long record. They require statements of facts and response to statement of facts and all the evidence, and a lot of it's here even in the appendix. Okay. We have your argument. You're out of time, and we thank you for the argument.